**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas HIGHTOWER, Defendant–Appellant.**

**No. 95–2327.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1996.

Decided Sept. 3, 1996.

Rodney Cubbie (argued), Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee.

Scott P. Phillips (argued), Milwaukee, WI, for Defendant–Appellant.

Before CUMMINGS, FLAUM, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Thomas Hightower was convicted by a jury on one count of conspiracy to possess with intent to distribute in excess of 5 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. § 2, one count of conspiracy to possess with intent to distribute heroin, in violation of the same statutes, and one count of use of a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1).[1] He presents three issues for our consideration on appeal: the sufficiency of the evidence for the drug counts, the sufficiency of the evidence for the gun count, and various errors in sentencing. We affirm the conviction and sentence on the drug counts and, in light of the Supreme Court's decision in *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), we vacate the conviction on the § 924(c)(1) count and remand for further proceedings.

---

1. The indictment charged Hightower with a violation of § 924(c)(1), and the jury was instructed pursuant to § 924(c)(1). However, the district court's order of judgment refers to § 924(g), even though it describes the offense as "use of a firearm in relation to a drug trafficking crime" rather than the offense described in § 924(g) of travelling across state lines or from a foreign country and acquiring a firearm for the listed purposes. On appeal, the parties have assumed that § 924(c)(1) is the only statute at issue. It appears, therefore, that the isolated reference to § 924(g) is a typographical error, which can be corrected on remand.

## I

Viewing the evidence in the light most favorable to the jury's verdict, as we must under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the record shows that Hightower (a.k.a. Zero) was involved in an elaborate drug distribution business with Marvin Linnear (his son, also known as B.K., who was indicted with him), Glen James, Charles Shaw, Ernest Parker, Andre Ferguson, Granville Windom, and others. In early 1990, Linnear and Parker began selling heroin and cocaine from Parker's residence on 5th Street in Milwaukee, Wisconsin. Later that year, at Linnear's direction, Shaw began working at a drug house on Palmer Street, also in Milwaukee. Approximately $3,000 worth of heroin and cocaine moved through the Palmer Street house every day. The conspirators expanded their operations to other houses later that year.

By mid–1991, Shaw had begun to cooperate with the government as a confidential informant. Shaw testified that he met "Zero," who is "B.K.'s father," in December 1991. He specifically stated that Zero was selling heroin and that Zero (Hightower) "was the leader of everybody." Additional evidence suggesting Hightower's central role in the conspiracy came from tape recordings of telephone conversations between Parker, who was by then in federal prison in Lompoc, California, and Hightower, James, and Carolyn Ward. In the recorded conversations, Parker urged the others to send him drugs, and the group discussed the status of the drug operation. Hightower and Parker complained that James spent too much money and was not sharing it with the others. Parker suggested that Walter Williams and Linnear might "shake up" James. Finally, Hightower assured Parker and the others that he was keeping track of the drug operation.

The evidence at trial showed the conspirators had extensive dealings with both heroin and cocaine. Without purporting to summarize all of it, we offer a brief chronological summary of the more notable incidents. At some point in late 1990 or early 1991, Shaw testified that he saw B.K. and another person bagging up about 2 kilos of cocaine at the 5th Street house. On February 11, 1991, members of the Milwaukee Metropolitan Drug Enforcement Group (Metro) executed a search warrant at a drug house located on 24th Street, where they recovered approximately 750 grams of cocaine packaged in 50 individual packets, along with other drug paraphernalia and a telephone bill with Windom's name on it. A few months later, on July 30, 1991, Milwaukee police officers attempted to break up drug distribution efforts going on at a house on North 45th Street. Shaw had informed them that the people at the 45th Street house were packaging and weighing about 2 kilos of cocaine, according to testimony from one of the detectives involved in the raid. The officers observed a high pile of white powdery material on the table, along with scales, grinders, cutting agents, and a gun, but by the time they were able to enter the house toilets were flushing and water was running in the sinks, and the white powdery pile was gone. Nine grams of heroin, however, were nevertheless recovered. Later, a plumber who was summoned to re-attach the toilet (which the police had dismantled during their search) found a plastic bag with "7,500 tin foil envelopes" in it clogging up the plumbing. Because of the water, lab technicians were not able to identify what had been in the packets, but various police officers testified that they believed from their direct observations of the activities prior to their attempted entry, and from the surrounding circumstances, that it had been drugs.

Between November 1991 and March 1992, Robertson testified that he was getting regular supplies of cocaine from James. He estimated that he sold 4 to 5 ounces of cocaine per day during that period of time—an amount that would equal an impressive 480 ounces, or more than 13.5 kilos, if he sold 4 ounces a day non-stop for 120 days. Even at a more modest rate of 4 ounces every other day, the total for the period exceeds 6.5 kilos. On March 18, 1992, Milwaukee police officers went to the home of Robertson's girlfriend to conduct a probation search. While they were there, James arrived with a paper bag in his hands. He fled, dropping the bag,

which later turned out to contain about 700 grams of cocaine. (In a recorded conversation, Hightower criticized James' unsuccessful effort to make a personal delivery of the drugs.) Materials seized during an August 18, 1992, search of another drug house run by the group at 27th Street corroborated the general scale of operations. In addition to extensive drug paraphernalia, the police seized $113,000 in cash. Earlier testimony at the trial had indicated that 1 gram of cocaine normally sells for about $100, and an ounce goes for $900 to $1400, depending on the purity of the drug. The $113,000 therefore could have corresponded to anything from slightly more than a kilo to more than 3 kilos (due to quantity discounts).

Hightower was arrested on August 20, 1992, at the Excel Inn in Glendale, Wisconsin, where he was staying with Ferguson. At the time, Hightower was lying on a bed with his head on a pillow. Underneath the pillow was a folded sweatshirt, and inside the sweatshirt, was a loaded five-shot handgun and $6,500 in currency. The arresting officer also recovered a fully loaded .9mm handgun and a pager from underneath the mattress where Hightower had been lying, as well as address books and memo pads showing Parker's and Linnear's names. Because he lied about his name, Hightower was released from custody on this occasion. Count III of the indictment focussed only on the Beretta .9mm model 92F gun that was found under the mattress on August 20, 1992.

## II

Our discussion of Hightower's sufficiency challenges to Counts I and II can be brief. Hightower argues that the taped conversations between Parker and himself did not amount to sufficient evidence to show that he was engaged in a drug conspiracy in the Eastern District of Wisconsin. He also claims there was no "direct" proof that he sold either cocaine or heroin as part of a conspiracy. Unfortunately, Hightower misunderstands both the nature of conspiracies and the type of proof that may be used to connect someone to the conspiracy.

As we noted above, we must consider the evidence, including all possible infer-

ences, in the light most favorable to the government. *Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789; *United States v. Brown,* 71 F.3d 1352, 1354 (7th Cir.1995). In order to prove a conspiracy, the evidence must show both the existence of the conspiracy and that the defendant knowingly participated in it. *United States v. Sasson,* 62 F.3d 874, 886 (7th Cir.1995); *United States v. Saadeh,* 61 F.3d 510, 525 (7th Cir.1995); *United States v. Blanding,* 53 F.3d 773, 779–80 (7th Cir.1995). The proof may come either from direct evidence or circumstantial evidence, in conspiracy cases just as in others. *United States v. Hickok,* 77 F.3d 992, 1005 (7th Cir.1996); *United States v. Yusufu,* 63 F.3d 505, 508 (7th Cir.1995); *Sasson,* 62 F.3d at 886; *United States v. Donovan,* 24 F.3d 908, 912 (7th Cir.1994). In this case, there was ample evidence that a jury might have accepted showing that the charged conspiracy existed and that Hightower was a part of it. Hightower himself does not seriously challenge the sufficiency of the evidence showing the existence of the conspiracy, nor could he. With respect to his own participation, the government must present "substantial evidence" that he was a member. It did so. Hightower's taped conversations with Parker showed not only that he was involved in the conspiracy but also that he had a leadership role. Shaw confirmed Hightower's central position in his testimony, calling Hightower "the leader of everybody." It makes no difference whether Hightower was personally selling either heroin or cocaine, as long as the evidence showed that he played a role that furthered the aims of the conspiracy and that other members were making the sales. Our review of the entire record leaves no doubt that the jury had ample evidence before it on which it could base its convictions on Counts I and II.

With respect to Count III, while the record again showed that the Beretta .9mm gun was seized from Hightower on August 20, 1992, between the time of his conviction and this appeal the Supreme Court decided *Bailey v. United States,*—— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). In *Bailey,* the Court held that to sustain a conviction under the "use" prong of 18 U.S.C. § 924(c)(1), the

government must prove that the defendant actively employed the firearm during and in relation to the predicate crime. The term "use" includes a variety of ways in which the firearm might actively be employed, such as brandishing, striking with, displaying, firing, making reference to the gun, and similar acts. It does not include the mere placement of a firearm nearby for protection or the nearby concealment of a gun to be available for a potential confrontation. See generally *Bailey,* —— U.S. at ——–——, 116 S.Ct. at 508–09; *United States v. Holmes,* 93 F.3d 289, 294 (7th Cir.1996); *United States v. Thomas,* 86 F.3d 647, 650–51 (7th Cir.1996); *United States v. James,* 79 F.3d 553, 553–54 (7th Cir.1996); *United States v. Monroe,* 73 F.3d 129, 133 (7th Cir.1995).

■ Here, the indictment charged that Hightower "did knowingly use and carry a firearm," referring only to the Beretta and restricting its scope to the August 20, 1992, incident. The district court instructed the jury under our pre-*Bailey* law, which allowed the jury to convict solely on the basis that Hightower had the gun "available to aid or facilitate the commission of a drug-trafficking offense." This, of course, is no longer the law. At oral argument, the government essentially conceded that the conviction on Count III would have to be vacated. The gun charged in this case was found under the mattress, making this case very like *United States v. Lamb,* 74 F.3d 751 (7th Cir.1996), where it was not enough to show use when the firearms were found under the pillow and under the bed. The government never introduced evidence indicating that Hightower carried the gun, and the fact that it was under a mattress distinguishes it from "carry" cases like *United States v. Booker,* 73 F.3d 706 (7th Cir.1996) (*per curiam*), where a gun was found under a car seat. There was no evidence that any other conspirator carried this particular gun, *cf. Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), and nothing indicated that Hightower (as opposed to Ferguson, who was with him) had carried the gun into the room.

This is therefore a case like *United States v. Abdul,* 75 F.3d 327 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 2569, 135 L.Ed.2d 1085 (1996), where the evidence in the record will not sustain a conviction under the law of use as the Supreme Court has now authoritatively interpreted it. Furthermore, the evidence at trial would not have supported a conviction under the "carry" prong of § 924(c)(1) either. It would therefore not be appropriate to remand Count III for a new trial on the alternate theory, as we have sometimes done. *Holmes, supra,* 93 F.3d at 293–94, 296; *United States v. Gonzalez and Ramirez,* 93 F.3d 311, 323 (7th Cir.1996); *Thomas,* 86 F.3d at 651; *United States v. Smith,* 80 F.3d 215, 220–21 (7th Cir.1996). The only step to be taken on this record is to vacate the conviction on Count III and to remand for dismissal of those charges.

Finally, we turn to Hightower's sentencing challenges. Based on the presentence report, the district court concluded that Hightower began with an offense level of 32, based on the fact that he was responsible for at least 5 kilograms of cocaine. See Sentencing Guidelines, § 2D1.1(c)(4). The court then added a two level enhancement under § 3C1.1 for obstruction of justice, due principally to Hightower's use of an alias on August 20, 1992, which allowed him to evade arrest and trial with his co-defendants. See *United States v. James, et al.,* Case Nos. 93–Cr–1708, 93–Cr–1724, 93–Cr–1798, 93–Cr–1855 and 93–Cr–1954, Eastern District of Wisconsin, *aff'd, United States v. James,* 40 F.3d 850 (7th Cir.1994). Finally, the court added three levels based on his role in the offense, under § 3B1.1(b), for a total offense level of 37. Hightower had a criminal history category of VI, which gave him a sentencing range of 360 months to life. Because of what the district court labelled as his "abysmal" record, the judgment indicated that the final sentence was 600 months for Counts I and II, to run concurrently. We note, however, that in its statement of reasons the court indicated it was giving Hightower concurrent sentences of 540 months each on Counts I and II, and that the mandatory consecutive 60 month sentence for Count III brought the total up to 600 months. This is inconsistent with what appears on page 2 of the judgment form, where it adds the 60 months for Count III to the 600 month sentences, for a total of 660 months. On re-

**216**

mand, the district court will have an opportunity to address this problem.

Hightower challenged both the base level offense of 32, on the ground that the record did not show that he was responsible for as much as 5 kilograms, and the role-in-the-offense enhancement. Neither of these points has merit. With respect to drug quantities, the Sentencing Guidelines require the court to consider all quantities that were "part of the same course of conduct or common scheme or plan as the offense of conviction." § 1B1.3(a)(2). Because this was a conspiracy, Hightower is accountable for all amounts that were reasonably foreseeable to him. *Thomas,* 86 F.3d at 655; *United States v. Claiborne,* 62 F.3d 897, 901 (7th Cir.1995); *United States v. Goines,* 988 F.2d 750, 775 (7th Cir.1993). We review the district court's determination of amounts only for clear error. *United States v. Acosta,* 85 F.3d 275, 279 (7th Cir.1996); *United States v. Wesson,* 33 F.3d 788, 797 (7th Cir.1994); *Donovan,* 24 F.3d at 917.

Without belaboring the point, our review of the evidence above demonstrates that the district court did not clearly err in finding that more than 5 kilograms of cocaine were involved in this conspiracy. The district court judge emphasized that he heard the trial evidence and that he was relying on the trial record to support this finding, as well as his recollection of the co-defendants' trials. While we would be less confident if the record of Hightower's trial did not fully support the court's finding, given the two-year hiatus between the co-defendants' trials and Hightower's, we can affirm the district court's finding if it is supported by the record. *United States v. Compton,* 82 F.3d 179, 184 (7th Cir.1996); *United States v. Corral-Ibarra,* 25 F.3d 430, 440 (7th Cir.1994).

Similarly, we review the district court's sentencing finding about a defendant's role in the offense for clear error. *United States v. Guiterrez,* 92 F.3d 468 (7th Cir.1996); *United States v. Randy,* 81 F.3d 65, 68 (7th Cir.1996); *United States v. Soto,* 48 F.3d 1415, 1420 (7th Cir.1995). The taped conversations with Parker were more than enough to show Hightower's managerial role.

Coupled with Shaw's statement that Hightower was the "leader of everybody," it is clear that this finding had ample support in the record. The evidence also supported a finding that the criminal activity involved five or more participants. While Hightower's sentence is undoubtedly a harsh one, given his age, we find no error in the district court's application of the Guidelines, and the court's choice of a sentence within the proper Guidelines range is not something we can review. *United States v. Shlater,* 85 F.3d 1251, 1257–58 (7th Cir.1996); *United States v. Allender,* 62 F.3d 909, 917 (7th Cir.1995); *United States v. Moore,* 25 F.3d 563, 570 (7th Cir.1994).

For the reasons stated, we AFFIRM Hightower's convictions on Counts I and II, and we VACATE his conviction on Count III. The case is REMANDED for resentencing on Counts I and II, so that the district court can consider its plan as a whole in sentencing, see *Thomas,* 86 F.3d at 656, and for dismissal of the charge on Count III.